UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
RITA FLYNN,                                          :
               Plaintiff,                  :
                                           :      **OPINION AND ORDER**
v.                                                   :
                                           :      17 CV 2864 (VB)
NEW YORK STATE DEPARTMENT OF                         :
CORRECTIONS and COMMUNITY                            :
SUPERVISION, MARY KOPP-ADAMS, and                    :
FRANK GEMMATI,                                       :
               Defendants.                 :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Rita Flynn brings this action under 42 U.S.C. § 1983, alleging defendants Mary Kopp-Adams and Frank Gemmati retaliated against her for exercising her First Amendment right to free speech. Flynn also alleges defendant New York State Department of Corrections and Community Supervision ("DOCCS") violated New York whistleblower protections for public employees under Civil Service Law Section 75-b by retaliating against her for reporting violations of law and threats to public safety.

      Before the Court is defendants' motion to dismiss the amended complaint under Rule 12(b)(6). (Doc. #34).

      For the reasons set forth below, defendants' motion is GRANTED.

      The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**BACKGROUND**

      For the purpose of deciding the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the amended complaint and draws all reasonable inferences in

plaintiff's favor, as set forth below.[1]

Flynn has been employed as a parole officer for DOCCS since 1979. From 2007 to October 28, 2016, Flynn worked as a sexual offender parole officer, supervising sex offenders released from prison on parole and "reviewing and enforcing the required regimen of Strict and Intensive Supervision and Treatment ('SIST') for affected parolees." (Am. Compl. ¶ 19).

Defendant Kopp-Adams is the director of the Sexual Offenders Management Unit ("SOMU") and has statewide supervision of DOCCS' SIST cases. Defendant Gemmati is DOCCS regional director for the Hudson Valley and is a regional supervisor for the SOMU.

In early September 2016, Flynn learned that DOCCS had proposed a preparatory investigative discharge plan ("discharge plan") for a "John Doe" inmate to be released to Liberty, New York. Doe is a serial sex offender who has a history of illegal sexual contact with children. After Flynn "made substantial recommendations to investigate and improve" the discharge plan, it was submitted to the Honorable Mary M. Farley, of the Supreme Court of New York, St. Lawrence County, ahead of the court's order approving Doe's release. (Am. Compl. ¶ 21).

Kopp-Adams assigned Flynn primary responsibility for arranging Doe's release and coordinating with the New York State Office of Mental Health ("OMH"), as OMH had primary responsibility for arranging Doe's housing and treatment.

In preparation for the court's order approving Doe's release, Flynn participated in meetings and correspondence regarding his proposed discharge plan. On September 16, 2016,

---

[1] The Court notes Flynn pleads facts without regard for chronology, clarity, or specificity. The Court summarizes the alleged facts in an order that attempts a logical timeline. The dates below are not dispositive of the motion, such that any error in construing the order of events is immaterial.

2

Flynn sent an email to DOCCS supervisors and others, in which she identified "significant weaknesses in the proposed supervision and the lack of a true regimen." (Am. Compl. ¶ 27).

The concerns raised in the September 16, 2016, email and in other communications to Flynn's colleagues were: (i) Sullivan County, where Doe was to be released, would not provide post-release mental health, sex offender, or drug treatment programming for Doe; (ii) OMH referred Doe to Catholic Charities to treat Doe's chronic heroin, ecstasy, and crystal meth addiction, but Catholic Charities does not provide intensive outpatient services; (iii) the location for Doe's "Options Counseling" was in a densely populated residential area far from Doe's residence, requiring Doe to wait for significant lengths of time for public transportation among other offenders while in close proximity to a school (Am. Compl. ¶ 27C); (iv) Doe's plan, as modified by OMH, had him attend drug treatment and aversion therapy in Newburgh, New York, less than fifty feet from the Human Resources Administration office that provides social services to children; (v) the motel where OMH planned to have Doe live housed seven other sex offenders and the motel owner acknowledged that families with children frequently stayed in the motel; (vi) Doe would not cooperate with Flynn's strict supervision; (vii) Flynn warned that absent close collaboration with OMH, Doe's case could "erupt into another media sensation" (Am. Compl. ¶ 27H); (viii) there was a lack of collaboration in creating a plan for Doe that would ensure community safety; and (ix) Doe's developmental disabilities would make independent life in a motel difficult, creating added pressure that would undermine his adjustment back into the community after incarceration.

Sometime in September 2016, Flynn spoke with an OMH liaison about these concerns. One hour after that conversation, SOMU Senior Parole Officer Bill Meyers told Flynn to "stand down" and allow OMH more time to develop a plan. (Am. Compl. ¶ 28).

On September 29, 2016, Judge Farley ordered DOCCS to plan for Doe's release by October 20, 2016. The court also noted Doe was a sex offender requiring SIST and enumerated ninety-four conditions of his release and supervision pursuant to N.Y.S. Mental Hygiene Law Section 10.11.

On October 13, 2016, Flynn attended a meeting to assess whether Doe's proposed discharge plan complied with definitions of SIST and the court's requirements. On October 14, 2016, Flynn emailed her superiors to reiterate her concern about the location of Doe's Options Counseling. Flynn recommended postponing Doe's release, writing, "At this time, due to the fact that the above captioned has no viable release program in place, we are requesting that the Court consider postponing [Doe's] release." (Am. Compl. ¶ 30). In the same email, and separately to Kopp-Adams verbally, Flynn raised her concern about housing Doe with other sex offenders because it could exacerbate his sexual impulses, particularly his sexual desire toward children.

On October 24, 2016, Flynn forwarded her October 14, 2016, email to DOCCS Deputy Commissioner Ana Enright. Flynn wrote that the forwarded email was relevant to Flynn's prior complaint that OMH had failed to create an integrated plan for Doe's release. A few days prior to forwarding the email to Enright, Flynn also forwarded the email to Orange County Forensic Coordinator for the Department of Mental Health, Meghan Keener, to warn her about the danger Doe posed, as he would be using services in Orange County.

On October 20, 2016, Flynn attended a meeting about Doe's release. At the meeting, Flynn voiced concern about the motel where Doe was to live, and stated Doe's developmental impairment made that living arrangement "inhumane." (Am. Compl. ¶ 38). At the meeting, "OMH's statewide Director of Office of Mental Hygiene's Sex Offender Program, Julie

Pasquini, objected and derided Flynn's concerns, stating that Flynn had impeded and interfered with Doe's release." (Id.).

After the October 20, 2016, meeting, Kopp-Adams telephoned Flynn and said "she had angered OMH in speaking out about the lack of an effective treatment plan for Doe." (Am. Compl. ¶ 39). Kopp-Adams added that Flynn's comments calling Doe's discharge plan "inhumane" were not appreciated. (Id.).

Sometime after his release from DOCCS custody, Doe encountered a crying baby while at the Sullivan County Department of Social Services. Doe "admitted," though it is unclear to whom, that he fantasized about sexually abusing the baby. (Am. Compl. ¶ 36). Flynn told Peekskill Bureau Chief Paul Pacheco about this incident.

On October 24, 2016, Flynn told an OMH official that the Newburgh program sites assigned for Doe's discharge plan were dangerously close to children. In response, the OMH official "reprimanded Flynn for her concerns and explained that Doe wasn't a severe predator that 'snatched' children off the street." (Am. Compl. ¶ 37). Flynn reiterated to the OMH official concerns about Doe's high risk of recidivism and community safety in light of the locations of Doe's treatment.

On or about October 25, 2016, Flynn notified Pacheco and Kopp-Adams that Doe was not using the correct stimulant as part of his court-ordered aversion therapy. Flynn told Kopp-Adams the "used stimulant" contained alcohol, which affected the court-ordered alcohol monitoring. (Am. Compl. ¶ 42). The same day, Flynn notified her superiors and Kopp-Adams of "Doe's repeated sexual arousal." (Am. Compl. ¶ 36). Flynn also told Kopp-Adams that Doe had not signed the OMH release plan, as required by law.

Also on October 25, 2016, the Newburgh Mental Health and Catholic Charities Director,

5

Meg Duffy, telephoned Flynn to express concerns that Doe had reported following a thirteen-year-old girl around a supermarket. Flynn then requested assistance providing Doe with a more structured and supportive arrangement.

On October 26, 2016, Dr. Tabassum Khan of the Newburgh Mental Health Clinic telephoned Flynn and described Doe as a "ticking time bomb" and "very dangerous." (Am. Compl. ¶ 44). Flynn repeated Khan's statements to Pacheco, who said he would "speak with Albany," but told Flynn not to put Khan's statements in writing. (Am. Compl. ¶ 45). Later that day Flynn sent Pacheco, Gemmati, Enright, and other DOCCS officials an email including Khan's statements.

On the morning of October 28, 2016, Flynn had a meeting with Pacheco, Gemmati, and supervisor Jenny Armstrong. Gemmati told Flynn she would be relieved from her special assignment in the SOMU. Gemmati stated Flynn was not collaborative with other SIST team members, and did not "play nicely in the sandbox." (Am. Compl. ¶ 54).

During the afternoon of October 28, 2016, Khan telephoned Flynn to relay a violent, sexual fantasy Doe reported having about a crying four-year-old. (Am. Compl. ¶¶ 49, 55). Khan told Flynn that Doe was too dangerous to remain in the community and that Khan would alert DOCCS.

Despite Flynn's removal from the SOMU, Pacheco nevertheless asked Flynn to draft a memorandum summarizing the risks Doe posed to the community and the parole violations Flynn had observed. Flynn prepared a draft on October 30, 2016. On November 1, 2016, DOCCS submitted an edited version of the memorandum to Judge Farley and Doe was reincarcerated that day.

Flynn now complains that Kopp-Adams and Gemmati retaliated against her for the exercise of her First Amendment rights, causing her to lose the overtime pay she typically earned in her SOMU special assignment as well as severe emotional distress. Flynn also claims her treatment by DOCCS constitutes a violation of New York whistleblower protections for public employees.

## DISCUSSION

I. Legal Standard

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiffs' legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

In considering a motion to dismiss, "a district court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). The court may nevertheless consider a document not incorporated by reference if the complaint "'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). However, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 111 (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 111 (quoting Faulkner v. Beer, 463 F.3d at 134).

II. First Amendment Claim

Defendants argue Flynn has not plausibly alleged a Section 1983 claim for First Amendment retaliation because she was not speaking as a private citizen when she expressed concerns about Doe's discharge plan.

The Court agrees.

To state a First Amendment retaliation claim, a plaintiff must plausibly allege "(i) he has an interest protected by the First Amendment; (ii) defendants' actions were motivated or substantially caused by his exercise of that right; and (iii) defendants' actions effectively chilled the exercise of his First Amendment right." Kuck v. Danaher, 600 F.3d 159, 168 (2d Cir. 2010) (citation omitted).

However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S.

8

410, 421 (2006). To determine whether a public employee's speech is protected, the Court must determine "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011)). "If the answer to either question is no, that is the end of the matter." Id.

Here, the question is not whether Flynn's speech addressed a matter of public concern—undeniably it did. Instead, the question is whether Flynn was speaking as a citizen rather than as an employee when she raised concerns about Doe's discharge plan. The Court concludes Flynn has not plausibly alleged she was speaking as a citizen in this context.

To determine whether a public employee speaks as a citizen, the Court must consider two things: (i) whether the speech "fall[s] outside of the employee's official responsibilities," and (ii) whether there is a "civilian analogue" to the method of speaking. Matthews v. City of N.Y., 779 F.3d at 173 (citation omitted).

"The inquiry into whether a public employee spoke pursuant to his or her official duties is 'a practical one.'" Montero v. City of Yonkers, N.Y., 224 F. Supp. 3d 257, 265 (S.D.N.Y. 2016) (quoting Weintraub v. Bd. of Educ., 593 F.3d 196, 202 (2d Cir. 2010)). "In making this determination, courts in the Second Circuit 'focus[] on the subject, manner, and context of the speech to determine whether it relates to topics that are indispensable prerequisites to effective performance of the speaker's primary employment responsibility, and thus not entitled to First Amendment protection.'" Id. at 265–66 (quoting Dillon v. Suffolk Cty. Dep't of Health Servs., 917 F. Supp. 2d 196, 208–09 (E.D.N.Y. 2013)) (alteration in original).

"Speech has a 'relevant civilian analogue' if it is made through 'channels available to citizens generally.'" Matthews v. City of New York, 779 F.3d at 175 (quoting Jackler v. Byrne,

658 F.3d at 238). "[A] form or channel of discourse available to non-employee citizens" includes methods like "a letter to the editor or a complaint to an elected representative or inspector general." Weintraub v. Bd. of Educ., 593 F.3d at 204.

Here, all of the statements Flynn made were related to her supervision of Doe, and therefore pursuant to her official duties. Flynn's position as a sexual offender parole officer included the following duties: "supervising the release of sex-offenders into the community-at-large" (Am. Compl. ¶ 3), "administering strict and intensive supervision of sex offenders released from prison on parole . . . closely monitoring sex offenders and protecting . . . children and citizens in the community from sexual offenders . . . [and] reviewing behavioral warning signs, and clinical and safety issues regarding those offenders." (Id. at ¶ 17). Flynn's duties also required coordination with "clinical treaters and local law enforcement" (id. at ¶ 18), as well as with OMH.[2]

Flynn's speech at issue unquestionably involved the job responsibilities described above. Therefore, her speech "owes its existence to [Flynn's] professional responsibilities" as a public employee and is not protected. Garcetti v. Ceballos, 547 U.S. at 421. Flynn argues the emails sent to Enright on October 24 and 26, 2016, were not part of her regular duties; however, the content of those emails pertained to supervising Doe's release, considering the impact of Doe's discharge plan on community safety, and working with treatment providers and OMH to ensure Doe's safe release, all of which were part of her regular duties.

---

[2] Flynn argues additional discovery is appropriate to determine the exact contours of her job duties. That argument is plainly without merit. Drawing all inferences in plaintiff's favor, the Court construes Flynn's job duties narrowly, as required under Fed. R. Civ. P. 12(b)(6), and applies the law to the facts as pleaded in Flynn's complaint.

Flynn argues her speech referred to larger structural issues. The structural issues Flynn identified cannot be analyzed in isolation. Flynn's statements link communications issues at OMH to specific problems with Doe's individual treatment. Flynn conveyed her worry about a media firestorm as a potential consequence of Doe's inadequate discharge plan. Tellingly, Flynn's "State Grievance Form," in which she summarizes her speech and alleged retaliation, makes no mention of any broader policy concerns. (Ranis Aff. Ex. A). Rather, Flynn alleges her removal from SOMU was due to "professional concerns, based on [her] detailed investigation of the case, regarding the release plans for a dangerous, serial sex offender proposed by OMH personnel." (Id. at 4).[3]

Moreover, Flynn's communications to supervisors and colleagues have no civilian analogue. A plaintiff's statements do not have a civilian analogue where the employee "acquired all of the information she relayed . . . in the ordinary course of performing her work." Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012). Here, Flynn was privy to information about Doe because of her position with DOCCS. But for Flynn's position as a sex offender parole officer, she would not have known about Khan's confidential medical concerns conveyed on October 26 and 28, 2016, or any of the other information used to determine Doe's discharge plan.

Flynn complained to supervisors at DOCCS and to colleagues at OMH and in the community in which Flynn worked as part of her supervision of Doe. Unlike the plaintiff in Matthews, Flynn did not complain to "an independent state agency responsible for entertaining

---

[3] Flynn goes on to summarize her duty to question an inadequate discharge plan: "I do not believe that being a team player negates my duty and responsibility to question and, if necessary challenge, recommendations that I, from my years of experience and in planning and supervising dangerous sex offenders, consider those recommendations to be a threat to the community, insufficient to meet the needs of the parolee, and that would place children in the community in harm's way of a serial predatory sex offender." (Ranis Aff. Ex A at 5).

11

complaints by any citizen . . . regardless of his status as a public employee." 779 F.3d at 175 (internal quotation marks omitted). Rather, Flynn's statements in meetings, emails, and in a draft report were made as part of the tasks she was paid to perform as a parole officer. See Harisch v. Goldberg, 2016 WL 1181711, at *10 (S.D.N.Y. 2016). Flynn argues her communications to Enright were outside the chain of command because Enright was several levels above Flynn at DOCCS. This argument fails, however, because Enright is not an official who entertains complaints from private citizens. Flynn's access to Enright stemmed solely from Flynn's employment at DOCCS.

Lastly, although Flynn alleges her complaints were expressly forbidden by her supervisors, that factor alone does not render her speech protected. "When a government employee concededly engages in speech pursuant to his official duties, the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech made as a private citizen." Anemone v. Metro. Transp. Auth., 629 F.3d 97, 116 (2d Cir. 2011). Here, Flynn's supervisors allegedly told her to "stand down" (Compl. ¶ 28), and not to put Khan's concerns about Doe in writing. Although Flynn did neither, because her speech was within her job duties and did not have a public analogue, insubordination alone does not render the speech protected.

Accordingly, Flynn's speech was not protected by the First Amendment and her Section 1983 claim must be dismissed.

III. State Law Claim

Having dismissed the only federal claim in this case, the Court does not have original jurisdiction over Flynn's state law claim.

"A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c)(3).

The Court declines to exercise supplemental jurisdiction over the remaining state law claim.

## CONCLUSION

The motion to dismiss is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #34) and close this case.

Dated: April 30, 2018
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge